UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

**(UNDER SEAL)**

I, Robert Zachariasiewicz, being duly sworn, state as follows:

**THE AFFIANT**

1.      I am a Special Agent with the Drug Enforcement Administration (DEA).  I have

been employed as a Special Agent with the DEA for over eight years.  Since June 2003, I have

been assigned to the DEA Special Operations Division in Chantilly, Virginia.   As a DEA agent, I

investigate violations of federal law related to narcotics trafficking contained in Titles 18 and 21 of

the United States Code.

2.      I am an "investigative or law enforcement officer" of the United States within the

meaning of Section 2510(7) of Title 18, United States Code.  I am an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated

in Section 2516 of Title 18, United States Code.

3.      I have participated in all phases of narcotics investigations involving the illicit

activities of domestic and foreign drug traffickers and domestic and international drug trafficking

organizations, including, but not limited to, conducting surveillance, gathering intelligence,

executing search warrants, questioning witnesses, using informants, using pen registers,

intercepting wire, electronic or oral communications, conducting undercover operations,

identifying and tracing monies and assets and conducting investigations in a foreign country in

cooperation with foreign law enforcement authorities.  I am familiar with the ways in which

domestic and international drug traffickers conduct their business, including, but not limited to, the

methods used in manufacturing and distributing narcotics outside the United States, the methods

and transportation routes used to import narcotics into the United States, the methods used to

distribute narcotics in the United States, the movement of funds, the use of satellite and cellular

telephones and digital display paging devices, and the use of numerical codes and coded language

to conduct illicit transactions.

## **BASIS OF AFFIDAVIT**

4.    I make this affidavit based on personal knowledge derived from my participation

in this investigation and based on information supplied to me from the following sources:

        a.  Oral and written reports about this investigation;

        b.  Interviews of confidential informants conducted by federal agents;

        c.  Video and audio-taped surveillance conducted by federal agents;

        d.  Consensual intercepted phone calls and email correspondence.

5.    Unless otherwise noted, wherever in this affidavit I assert that a statement was

made, the information was provided by another law enforcement officer (who may have either

direct or hearsay knowledge of the statement) with whom I have spoken or whose report I have

read.  Such statements are reported in substance, unless otherwise indicated.  Similarly,

information resulting from surveillance, except where indicated, does not set forth my personal

observations but rather has been provided to me directly or indirectly by other law enforcement

officers who conducted such surveillance.

6.    Since this affidavit is being submitted for the limited purpose of obtaining a

complaint, I have not included each and every fact known to me concerning this investigation.

## PURPOSE OF AFFIDAVIT

7.      This affidavit is submitted in support of an application for a complaint charging

**Harol Rodrigo SUAREZ-Garcia**, alias "Jose Luis Herrera", alias "Chico", alias "Dominick";

**Dario CASTRO**, alias "Alberto"; **Estuardo GONZALEZ**, alias "Anthony Camargo", alias

"Compadre", alias "Compa"; and **Caesar RAMIREZ**, alias "Compadre", with unlawfully,

knowingly and intentionally conspiring (1) to import five kilograms or more of a mixture and

substance containing a detectable amount of cocaine, a Schedule II controlled substance, into the

United States from the Republic of Colombia, the Republic of Panama, and/or the Republic of

Nicaragua, and elsewhere, in violation of Title 21, United States Code, Sections 952 and 960; and

(2) to manufacture and distribute five kilograms or more of a mixture and substance containing a

detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such

substance would be unlawfully imported into the United States, in violation of Title 21, United

States Code, Section 959 and 960.  I have been advised by attorneys from the U.S. Department of

Justice that venue for this prosecution is proper in the United States District Court for the District

of Columbia under title 21, United States Code, Section 959(c); all in violation of Title 21, United

States Code, Section 963; in conjunction with Title 21, United States Code, Sections 959(a)(1) and

960, and Title 18, United States Code, Section 2.

## FACTS ESTABLISHING PROBABLE CAUSE

8.      Since October of 2003, the DEA Las Vegas District Office (LVDO) and

Las Vegas Metropolitan Police Department (LVMPD) have been conducting an investigation with

the assistance of other foreign national domestic law enforcement agencies, including the DEA

Special Operations Division in Chantilly, Virginia, as well as DEA offices in Managua,

Nicaragua; Panama City, Panama; and Cartagena, Colombia.  This is an investigation of a cocaine

trafficking organization operating out of South and Central America, intending to ship loads of cocaine and heroin to destinations in the United States including Las Vegas, Nevada.

9.    In October of 2004, a LVDO Confidential Source (CS) contacted a Guatemalan drug trafficker known as ---------------------- in order to arrange the shipment of cocaine and heroin from Central America to the United States.

10.    On October 19, 2004 through October 22, 2004, a Panamanian undercover agent (UC), under the supervision of the DEA Panama City Country Office (PCO), met with ------ ------------ in Panama City, Panama to discuss the purchase and shipment of cocaine and heroin into Las Vegas.  During the meeting, the UC was introduced to a Colombian drug trafficker known as Armando, last name unknown (LNU).  Through DEA intelligence and CS information, Armando LNU was subsequently identified as Colombian drug trafficker Harol Rodrigo Suarez. Suarez advised the UC that he worked for a guerilla organization in Colombia and could provide multi hundred-kilogram amounts of cocaine.  The UC advised ------------------ and Suarez that he would contact them in the near future to make the purchase.

11.    A few days after the meeting in Panama, the CS was contacted by Suarez. Suarez asked the CS to travel to Panama in order to meet his (Suarez') associates.  Suarez said he was currently in possession of 700 kilograms of cocaine but needed to speak with the CS in person in order to make the transaction.  The CS advised Suarez that he could not travel to Panama at that time. Suarez said he would communicate with the CS via e-mail to discuss the purchase of cocaine and heroin.  Suarez said his e-mail address was ---------------------.

12.    During November 2004 and up to November 17, 2004, the CS exchanged several telephone calls with Suarez regarding the purchase of heroin.   After these calls, on November 17, 2004, the CS received an e-mail from ----------------------. The message contained the following information: "Hello buddy.  My friend from the town called and he's ready to send the letters.  He only needs 3000 and we can settle the rest here and I can send even up to df.  If you want, I can take it myself to him.  And Mexican cousins will route it to Angela and I'll take the bus to there.  I can get three weekly there or to df or over there.  They charge me 14,000 and

receive them every Sunday at 11 PM.  You have to pick up the children at the theater that week and that way you don't invest so much and it helps me carry out my project and I will help you and have faith in me that I won't betray you.  If ideas interest you, tell me so I can write to you step by step and I'll send you the estimate.  The point is to start and with me you will not lose.  If you want I will stay as a guarantee until you receive the children.  Let me know if you want us to chat about it and I'll have it ready here but you know at 18,000 and I'm only asking for half to buy it from my house which is more economical and I have the arrival to here and then I will put it in your hands."

13.     Based on information from the CS and your affiant's experience in drug law enforcement, and based on debriefings of the CS with respect to the above-described e-mail, Suarez advised the CS in the above described e-mail that he is ready to send narcotics.  This conclusion stems from the CS advising your affiant, in a debriefing, that the word "letters" is a code word for narcotics, and that this word was used previously by Suarez to indicate narcotics in other conversations with the CS.   Suarez advised the CS in the above described e-mail that he only needs $3000 as a down payment for the narcotics.  This conclusion stems from the CS advising your affiant, in a debriefing, that 3000 refers to a $3000 down payment for narcotics previously mentioned by Suarez in other conversations with the CS.   Suarez advised the CS in the above described e-mail that he can transport the narcotics from Central America to Mexico.  This conclusion stems from the CS advising your affiant, in a debriefing, that  "df" is a code word for Mexico, and that this code is commonly used by drug traffickers in Central America.  Suarez advised the CS in the above described e-mail that he has Mexican drug couriers to transport narcotics to an unknown person named Angela.  This conclusion stems from the CS advising your affiant, in a debriefing, that the word "cousins" is a code word for drug couriers, and that this code is commonly used by drug traffickers in Central America.  The CS also advised your affiant that he/she does not know who Suarez was referring to when he mentions Angela.  Suarez advised he can provide the CS heroin in Guatemala for $18,000 per kilogram.  Your affiant knows through his training and experience that a kilogram of heroin sells for

approximately $18,000 in Central America.  Additionally, the CS, who previously resided in Guatemala, indicated that a kilogram of heroin sells for approximately $18,000.  In the above mentioned e-mail (as detailed in paragraph 12), Suarez also advises the CS that he (Suarez) can provide three kilograms of heroin every week to the CS, as indicated by the phrase:  "I can get three weekly...". Finally,  Suarez advised the CS to pick up narcotics that week.  This conclusion stems from the CS advising your affiant, in a debriefing, that the phrase "pick up the children at the theater" is a coded phrase which means to receive narcotics, and that this coded phrase is commonly used by drug traffickers in Central America.

14.    On November 18, 2004, your affiant received the following information from MSN Hotmail, 1065 La Avenida, Mountain View, California pursuant to a DEA Administrative Subpoena regarding e-mail account ----------------------: First Name: ------, Last Name: -------, Country: Guatemala, Registered from IP: --------------, Date Registered: 10/29/2004 at 8:25:29 AM.  Further DEA intelligence information indicates the account is currently being accessed from Guatemala and El Salvador.

15.    During 2005, the CS and Suarez have exchanged at least 70 telephone calls and at least 20 e-mails regarding the purchase of heroin and cocaine.  During these communications, Suarez advised the CS that he was interested in exchanging heroin and cocaine for weapons.  He also advised that his (Suarez') associates were Colombian paramilitaries who were in need of AK-47 rifles and C-4 explosives.  The CS told Suarez that he may be able to provide Suarez' organization with weapons.

16.    On April 21, 2005, the CS received an e-mail from --------------------.  The message contained the following information:  "Hello bud.  Around here, seeing what happened with the alka.  We're going to enter for the moment.  Let me tell you that I have gold that is low.  But I have it put away with my buddies but they don't have the exit.  If you want I can get it close to Juana the Cuban.  And around here I have a silversmith shop.  If you want to enter from Honolulu.  I am ready to pass it.  What you tell me brother the date has arrived of immigration

the passport this past week.  I fixed it for some cousins who came from my ranch and one went

to Spain and the others went to Japan and arrived fine.  Regards, we'll be in communication."

        17.    Based on information from the CS and your affiant's experience

in drug law enforcement, Suarez advised the CS in the above described e-mail that he (Suarez) is

still interested in purchasing AK-47 rifles for his organization in Central America and Colombia.

This conclusion stems from the CS advising your affiant, in a debriefing, that the word "alka" is

a code word for AK-47 rifles, and that this word is commonly used by arms traffickers in Central

America.  Suarez said he has heroin available at a good price but he had to store it because he is

having trouble moving it out of Central America.  This conclusion stems from debriefings with

the CS, where the CS advised that the word "gold" is a code word for heroin, commonly used by

drug traffickers in Central America.  Suarez said he can transport the heroin close to the

Mexico/United States border.  Suarez said he has a cocaine factory in Honduras and the CS can

receive the cocaine from there (in Honduras).  Suarez said he obtained fraudulent passports and

has successfully sent couriers to Spain and Japan with narcotics.    Based on a debriefing, the CS

advised that "Juana the Cuban" is a drug trafficker who operates along the Mexico/U.S. border.

The CS also advised that "silver" is a code word for cocaine, commonly used by drug traffickers

in Central America, and that "silversmith shop" is a code word for a cocaine factory.  The CS

also advised that "Honolulu" is a word previously used by Suarez to mean "Honduras".  The CS

also advised your affiant that Suarez previously told the CS that he needed fraudulent passports

for his (Suarez') drug carriers.  Accordingly, based on information from the CS, "cousins who

came from my ranch" is a code phrase for drug couriers.   Additionally, "arrived of immigration

the passport" pertains to the fraudulent passport.  The conspirators used similar code language in

future intercepted emails and telephone conversations with the CS discussed in this affidavit.

Henceforth, this affidavit will merely summarize those conversations and emails, as interpreted

by the CS.

18.   On June 21, 2005, the CS, under the supervision of the DEA Tegucigalpa, Honduras Country Office (TCO) and Honduran National Police, met Suarez in Tegucigalpa in order to arrange the details of the narcotics transaction.   During the meetings, Suarez again advised the CS that his associates were interested in exchanging narcotics for weapons.   The CS told Suarez he could provide weapons and would arrange a meeting in the near future to conduct the transaction.   This meeting was video and audio recorded by DEA.

19.   On November 4, 2005, the CS met with Suarez ( aka Jose Luis Herrera) and Estuardo Gonzal/ez (aka Anthony Camarco) in Managua, Nicaragua.   They had a brief initial meeting in which Gonzalez apologized for missing an initial planned meeting in Nicaragua, which had been cancelled due to storm.   Gonzalez explained that he would be sending Suarez alone to the weapons flash because things were "hot" in Nicaragua.   The Nicaraguan police had arrested him with a lot of cocaine about three months ago.   This information was subsequently verified by the DEA Managua, who surmised that Gonzalez had bribed his way out of jail. Gonzalez pointed out to the CS that it was worse to get arrested with AK-47 rifles and C-4 explosives, as opposed to mere cocaine, due to the harsh new terrorism laws.

20.    Thus, the CS took only Suarez to the weapons flash.  The weapons were provided by the Nicaraguan National Police (NNP) at a secret location.   A Nicaraguan National Police (NNP) undercover officer (UC) accompanied the CS in conducting the weapons flash to Suarez. Suarez was shown a multitude of AK-47's, C-4, M-79's M-60's, RPG's and ammunition.   Suarez was allowed to photograph and video the weapons and did so with a digital camera.   The weapons flash itself was surreptitiously video and audio recorded by DEA.   Subsequent to the flash, Suarez showed his photographs and video to both Gonzalez and another associate, Daniel LNU.

21.    The next day, on November 5, 2005, the CS again met with Suarez and Gonzalez, this time in a video/audio-taped hotel room, to fine tune the details of the weapons deal.

Gonzalez indicated that he had seen Suarez' video of the weapons and that he was satisfied.  He

asked where the CS had gotten them, and the latter explained  he had obtained them from an

Arab man in New York city, in exchange for heroin.

22.    Gonzalez negotiated with the CS the price of the cocaine for the weapons.

Gonzalez instructed Suarez to write everything down and take it to their people.  Gonzalez asked

where the CS got the weapons.  CS said he got the weapons from an Arab from New York in

exchange for heroin.  Gonzalez said he was happy with the weapons and would call the CS in the

near future.  The CS and Gonzalez finally agreed on the exact number, weapons types, and price

ratios for the  exchange, as follows:

            600 AK-47's     Price (150 kilos of cocaine or 75 kilos of heroin)
            10 M-60's             (10 kilos of cocaine or 5 kilos of heroin)
            15 M-79              ( 30 kilos of cocaine or 15 kilos of heroin)
            50 kgs C-4          ( 200 kilos cocaine or 100 kilos of heroin)
            250 cases Ammunition AK-47    (4000 kilos cocaine)
            6 RPG-7's             (12 kilos cocaine or 6 kilos heroin)
            40 RPG Rounds        (400 kilos cocaine or 200 kilos heroin)

Thus, the ratio breakdown was:  4 kgs. cocaine for 1 AK-47; 1 kg. for 1 M-60; 2 kgs. for 1 M-79;

2 kgs for 1 PKM; 4 kgs for 1 lb. C-4; 16 kg. for 1 case (can) AK-47 ammo; 2 kgs. for 1 RPG-7;

and 10 kgs. for 1 RPG round.

23.    During the meetings Suarez stated that due to an ongoing cocaine war between

the AUC and FARC, it may be too difficult to get the cocaine out of Colombia.  Suarez stated

that it would be much easier to get heroin out but that the required quantity would take time to

put together.  Suarez suggested that it might be easier to pay for the weapons in cash.  If the

weapons were to be paid for in cash, then the agreed price would be $1.5 million for all the

weapons the CS had.  The CS stated that he would need a deposit to hold the weapons.  The CS

asked for 1/3 but agreed on $330,000.  This amount, according to Suarez, would be given to the CS on November 7, 2005 with the balance being delivered on November 9, 2005 when the weapons are turned over.  Suarez, Gonzalez and "Daniel" sent the photographs back to Colombia via e-mail account ------------------.  CS information indicates that this is one of the accounts Suarez and his associates utilize to facilitate their illicit activities.

24.    The Managua Country Office (MCO) and NNP developed a second number being used by Suarez as ------------.  Suarez indicated that another member of the organization may be coming to Nicaragua from Colombia to oversee the delivery of the weapons but in any case they wanted the weapons on November 9, 2005 for shipment.  The CS also told the group that he would want to be sure that the money the group was using to pay for the weapons was not counterfeit so he would want to check it before the weapons would be released.

25.    Although the group seemed pressured to get the weapons back to Colombia, they never came up with the funds for the deposit.  Although no money or cocaine has been paid for weapons to date, the group continues to negotiate with the CS.

26.    On November 7, 2005, your affiant received the following information from MSN Hotmail, 1065 La Avenida, Mountain View, California pursuant to a DEA Administrative Subpoena regarding e-mail account --------------------: First Name: -----, Last Name: ----- -----, Country: El Salvador, Registered from IP: ------------, Date Registered: 08/14/2005 at 3:06:28 AM.  Further DEA intelligence information indicates the account has been accessed from Spain.

27.    Based on your affiant's experience in drug law enforcement, drug traffickers are known to use fictitious identities in order to avoid being apprehended by law enforcement officials.

28.    On November 14, 2005, United States Magistrate Judge Robert J. Johnston signed a search warrant for e-mail account ------------------.  Later that day, your DEA personnel faxed a

copy of the search warrant to MSN Hotmail.  On or about November 21, 2005, DEA personnel received a compact disk from MSN Hotmail pursuant to the search warrant.  The disk was subsequently examined by DEA Special Agent Tony Casullo and IA Kelly Ramos but no e-mails relevant to this investigation were found.

29.     On or about December 26, 2005, the CS received a telephone call from Suarez. During the call, Suarez advised he had sent an e-mail to the CS regarding the purchase of heroin and cocaine in Central America.  During this time, Suarez advised the CS that he (Suarez) would be utilizing e-mail account ---------------------- to communicate regarding the pending weapons for narcotics transaction and future purchase of heroin and cocaine.

30.     On December 26, 2005, the CS received an e-mail from ---------------------.  The message contained the following information:  "Comrade, have something going out for the sum of $5000 and goes out to Italy or Spain or wherever you want to send it and I have students and the gold goes out from here for 8000 and the silver goes out for 2000 per unit and some letters going out for 300 points and go out from Venice to anywhere in the world – He just needs an address where to arrive and recommend at least three times per week – missed your call 316-333-4011.  Merry Christmas and prosperous New Year, greetings to your wife and family – Luck."

31.     Based on information from the CS and your affiant's experience in drug law enforcement, Suarez advised the CS in the above described e-mail that he (Suarez) is sending narcotics to Italy and Spain for $5,000.  This conclusion stems from the CS advising your affiant, in a debriefing, that Suarez previously advised him/her (CS) that he (Suarez) is sending cocaine and heroin to Italy and Spain.  The CS and your affiant are unclear what type of narcotic Suarez was sending to Italy and Spain for $5,000.  Suarez said he employs couriers to transport heroin for $8,000 per kilogram and cocaine for $2,000.  This conclusion stems from debriefings with the CS, where the CS advised that the word "students" is a code word for couriers, "gold" is a code word for heroin and "silver" is a code word for cocaine.  The CS advised these code words

are commonly used by drug traffickers in Central America. The CS is unclear what Suarez was referring to in regards to letters going out from Venice to anywhere in the world for 300 points. In the e-mail, Suarez gives the CS a new Colombian telephone number to contact him at during the Christmas and New Year holiday season. The number Suarez gives to the CS is ------------. This conclusion stems from the CS advising your affiant, in a debriefing, that Suarez previously advised him/her (CS) to contact him (Suarez) at Colombian telephone number -------------------.

32.    On or about December 29, 2005, the CS, under the supervision of DEA Special Agent Tony Casullo, contacted Suarez at Colombian telephone number -------------------. This is the same telephone number Suarez gave to the CS in an e-mail from --------------------- on December 26, 2005 (as detailed in paragraph 30). During the call, Suarez advised the CS that he had heroin and cocaine available in Central America. Suarez also discussed arranging a meeting in Panama in order to introduce the CS to his superiors. Suarez said his superiors were very interested in purchasing the weapons the CS had in Managua, Nicaragua (as detailed in paragraph 20).

33.    On December 30, 2005, your affiant received the following information from MSN Hotmail, 1065 La Avenida, Mountain View, California pursuant to a DEA Administrative Subpoena regarding e-mail account -----------------------: First Name: -----, Last Name: -----, Country: SV, Registered from IP: -------------, Date Registered: 01/26/2003 at 6:01:20 PM.

34. On February 27, 2006, the DEA Cartagena Resident Office (CRO) and Colombian National Police (CNP) conducted surveillance of a meeting between the CS, SUAREZ, Dario CASTRO and Cesar RAMIREZ in Cartagena, Colombia. The CS was wearing a body-wire, so the meeting was successfully audio-recorded. The purpose of the meeting was to introduce the CS to members of the AUC (CASTRO and RAMIREZ) and finalize the details of the weapons for narcotics transaction. During the meeting, CS asked Ramirez if he could help

with the transaction. Ramirez said Castro was the boss. Castro said they were ready to do the deal, either in Colombia or Panama. Castro said he had a cocaine lab about 22 hours drive into the mountains from Bogotá that could produce about 350 kilos every 48 hours. The CS and his associates would have to stay in Colombia for 15-20 days until the cocaine order was ready, at which time Castro would call his contact in the Colombian Navy to ensure the load could be taken out of the Colombian coast safely. Under that plan, the CS would bring the weapons by boat and the drugs would be exchanged for the weapons via boat on the high seas. Alternatively, Castro suggested the drugs could be handed over in Panama, where they had 2000 kilos ready.

35. However, the CS said he was still not ready to receive cocaine. He said he needed to do the deal in either Panama or Nicaragua in about two weeks. Ramirez asked if the CS if he could come up with 25% in cash for additional cocaine. This cocaine is in addition to what would be given to the CS for the weapons. CS said the business would be conducted in Panama in 2 to 3 weeks and agreed to take more cocaine in return for 25% in cash and the weapons flashed in Nicaragua in November. The CS, Castro, Suarez and Ramirez finally all resolved themselves to do the deal in Panama in 2 to 3 weeks, and that the CS would call them in the near future concretize the details.

36. On March 20, 2006, the CS placed a consensually recorded telephone call and spoke with Dario Castro. During the conversation, Castro and the CS discussed the costs of transporting cocaine from Colombia to Las Vegas, Nevada. Castro advised the CS that he (Castro) will be giving the CS 200 kilograms of cocaine privately in Panama in order for the CS to sell in the United States, in addition to the cocaine being provided by his organization for the drugs for weapons deal.

37.  The CS and Castro agreed that on Wednesday March 29, 2006 Castro would be sending an associate to meet the CS in Managua, Nicaragua in to order to again verify the weapons that will be traded for cocaine in Panama.  After that final weapons flash, the CS would then travel to Panama to meet on March 31, 2006 with Castro and other coconspirators, who the CS understood to be Suarez, Gonzalez, Ramirez, possibly a person known as "Flaco" (who is not yet charged in this case), and other unidentified associates, at which time he would be shown the 1,000 kilos of cocaine to be traded for the weapons.  If the CS is satisfied with the drugs, Castro will give him the coordinates of a clandestine airstrip in Venezuela to deliver the weapons by plane.  Upon delivery of the weapons in Venezuela, the drugs will be turned over in Panama.

38.  On March 21, 2006, the CS received a call from Suarez advising that his boss, Castro, would be calling the CS in a few minutes, and for the CS to be ready for the call.  The CS recorded the call from Castro, who said he was making preparations for the upcoming meeting in Panama on March 31.  Castro again stated he would be giving the CS an additional 200 kilograms of cocaine on credit for the CS to sell in the United States.  The CS explained that the price of one kilogram of cocaine in Las Vegas is $16,800,  while the price rises to $21,000 in the other areas of the United States that the CS transports drugs to.  Castro said he understood.

39.  The CS asked Castro if they are still meeting in Panama on March 31 and Castro said yes.  Castro again stated his associate would verify the weapons in Managua on March 28.  The CS advised Castro that he/she would have everything in place to conduct the transaction on March 31 in Panama, and Castro agreed.  Castro said he would give the CS the location to send the weapons next week.

14

40. On March 28, 2006, the CS received a telephone call in the United States from a man who identified himself only as "Santiago". Santiago, later identified as Carlos Barreto, advised the CS that he was calling on behalf of Suarez and was waiting in Managua, Nicaragua to meet with the CS to view the arms that the CS was to provide. The CS responded that he/she would arrive in Managua later that same day. Upon arriving in Managua later on March 28, 2006, the CS made a consenually recorded telephone call to Santiago and advised Santiago that they would meet the following morning to view the arms.

41. On March 29, 2006, the CS made a consenually recorded telephone call to Santiago and arranged to meet with Santiago. The CS met with Santiago with several DEA Agents performing surveillance. The CS and a NNP Officer acting in an undercover capacity transported Santiago to an undercover location where they showed him a large cache of military-grade arms to include assault rifles, grenade launchers, and high powered rounds. Santiago inspected the weapons thoroughly and called Castro on the telephone to inform Castro that the weapons were acceptable and to continue with plans to deliver the CS approximately 1,000 kilograms of cocaine in Panama on March 31, 2006. Santiago then informed the CS that he would be traveling to Panama on March 30, 2006 to be present for the cocaine delivery.

**The Defendants**

42. On March 29, 2006, the undersigned swore out and filed (under seal) a complaint against defendants Harol Rodrigo SUAREZ-Garcia, alias "Jose Luis Herrera", alias "Chico", alias "Dominick"; Dario CASTRO, alias "Alberto"; Estuardo GONZALEZ, alias "Anthony Camarco", alias "Compadre", alias "Compa"; and Caesar RAMIREZ, alias "Compadre"

15

(collectively, the March 29 codefendants) on the charges of unlawfully, knowingly and intentionally conspiring (1) to import five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, into the United States from the Republic of Colombia, the Republic of Panama, and/or the Republic of Nicaragua and elsewhere, in violation of Title 21, United States Code, Sections 952 and 960; and (2) to manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959 and 960.

43. As to the present Complaint, defendant Carlos Ernesto BARRETO-Sierra, alias "Santiago" is a Colombian citizen, born June 9, 1978; Colombian passport number 79949373. He is 5'10" and weighs 170 pounds.

## Confidential Source

44. The Confidential Source herein referenced (CS) is a confidential informant for the DEA. He/she is paid by the DEA for the information he/she provides. CS has a long history in Colombian drug trafficking operations and has worked for DEA since 2000. CS has transported narcotics, weapons and narcotics proceeds for drug trafficking organizations with ties to the AUC. CS has knowledge of the clandestine airstrips used to transport cocaine and in the past his/her information has proven to be reliable and accurate.

45. CS stated prior to working for the DEA, he/she was employed by Guatemalan drug trafficker and AUC associate Victor Manuel CRUZ-Garcia. While employed by CRUZ-Garcia

16

during the 1990's, the CS constructed hidden compartments to conceal narcotics, weapons and narcotics proceeds. On one occasion, the CS unassembled weapons and hid the pieces in tractors. The tractors where then shipped through various countries in Central and South America. Since working on this investigation for the DEA LVDO, the CS has been responsible for the indictment of three AUC associates and one ranking member of the AUC. Also as a result of his/her information and assistance with this investigation, approximately $200,000 in drug proceeds was seized from drug traffickers in New York, New York by the DEA.

## Conclusion

46. Based on the foregoing, there is probable cause to believe that Carlos Ernesto BARRETO-Sierra, alias "Santiago" is guilty of unlawfully, knowingly and intentionally conspiring with the March 29 codefendants, and others known and unknown to the undersigned, (1) to import five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, into the United States from the Republic of Colombia, the Republic of Panama, and/or the Republic of Nicaragua and elsewhere, in violation of Title 21, United States Code, Sections 952 and 960; and (2) to manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959 and 960. I have been advised by attorneys from the U.S. Department of Justice that venue for this prosecution is proper in the United States District Court for the District of Columbia under title 21, United States Code, Section 959(c); all in violation of Title 21, United States

Code, Section 963; in conjunction with Title 21, United States Code, Sections 959(a)(1) and 960, and Title 18, United States Code, Section 2.

      Subscribed and sworn to this _____ day of March, 2006.

_____

Robert Zachariasiewicz
Special Agent
U.S. Drug Enforcement Administration